**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

ROCKLEDGE ASSOCIATES LLC,      *

     **Plaintiff/Counter-Defendant,**    *

v.                                **Case No.: PWG-16-710**

                               *

TRANSAMERICA LIFE INSURANCE CO.,

                               *

     **Defendant/Counter-Plaintiff.**

                               *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION[1]**

The parties to this case are landlord and tenant under a ground rent lease ("Ground Lease"), an archaic but still used real estate contract granting use of the property and ownership of any improvements to the tenant while allowing the landlord to retain ownership of the land. When Defendant/Counter-Plaintiff Transamerica Life Insurance Company, the tenant ("Transamerica" or the "Tenant"), elected to stop paying ground rent and attempted to walk

---

[1] I note at the outset the exceptional manner in which counsel for the parties cooperated in preparing a joint statement of underlying facts and joint record. This undoubtedly inured to their clients' benefit by reducing the cost of briefing this factually-complex and legally intriguing case. But even more so, their cooperation, along with counsels' agreement to *shorten* the page limits on their briefs, has enabled the Court to resolve this case much quicker than it would have been able to do if traditional briefing procedures had been employed. Such cooperative behavior—without the slightest diminution of the appropriately forceful advocacy on behalf of their clients—should be commonplace, but it is not. Too often, lawyers mistakenly believe that the adversary system somehow compels, or at least justifies, making the briefing of an issue on dispositive motions a confrontational process, requiring submission of individual statements of fact and exhibits (often duplicative) and "briefs" of maximum length, meeting (or even exceeding) the Court's established page limit. But this is the mark of a lawyer lacking confidence in his skill and in awareness of what truly serves his client's interests, and it is a shame. The lawyers in this case have not fallen prey to temptations of gratuitous contrariety. Their professionalism and skillful presentations have made it a privilege for the court to work with them to resolve this case. Well done.

away from the Ground Lease and allow Plaintiff/Counter-Defendant Rockledge Associates LLC, the landlord ("Rockledge" or the "Landlord"), to assume possession of the premises and to claim title to the buildings on the premises, Rockledge instead filed this suit for breach of covenant to recover the unpaid rent.  Compl., ECF No. 1.  Transamerica has moved for summary judgment, arguing that its default terminated the lease and the Landlord's only remedy was to acquire title to the buildings on the property, such that it is not entitled to damages for unpaid rent.  Def.'s Mot., ECF No. 43.  Rockledge has filed a cross-motion for summary judgment, insisting that it is entitled to judgment in its favor, based on Transamerica's undisputed failure to pay rent, because its option to terminate the lease, repossess the property and acquire title to the buildings on it (which it never exercised) was an alternative remedy to seeking damages for breach of covenant, not an exclusive remedy.  Pl.'s Cross-Mot., ECF No. 44;[2] Pl.'s Opp'n & Mem. 9.

I find that the plain language of the contract permits the landlord to seek damages for unpaid rent, and the undisputed evidence shows that Rockledge properly pursued its claim for breach of covenant.  But, because the Complaint served as a written notice of default and Transamerica did not cure that default, I find that the Ground Lease terminated thirty days after service of the Complaint, and Transamerica is liable only for rent through that date.  Accordingly, I will grant Rockledge's motion in part and deny it in part, and I will grant Transamerica's motion in part and deny it in part.

## Ground Rent Lease

Before turning to the facts underlying the dispute in this case, a little historical context will go a long way in facilitating an understanding of the contrary positions that Rockledge and

---

[2] The parties fully briefed the motions.  ECF Nos. 43-1, 44-1, 45, 46.  A hearing is not necessary.  Loc. R. 105.6.

Transamerica assert.  While most land in this country is acquired in fee simple, the ground rent

lease, "a centuries-old home financing tool . . . [w]ith roots in feudal England" still is common in

Maryland, "although little known elsewhere in the United States."  *State v. Goldberg*, 85 A.3d

231, 234 (Md. 2014) (citing *Banks v. Haskie*, 45 Md. 207, 218 (1876)).

> A ground rent lease . . . is a renewable 99 year lease where the fee simple owner
> of a property receives an annual or semi-annual payment ("ground rent") and
> retains the right to re-enter the property and terminate the lease if the leaseholder
> fails to pay. The fee simple owner retains a real property right in the land, but the
> leaseholder's interest is governed by the law of personalty.

*Muskin v. State Dep't of Assessments & Taxation*, 30 A.3d 962, 965 (Md. 2011) (citing *Kolker v.*

*Biggs*, 99 A.2d 743, 745 (Md. 1953).  Under this mutually beneficial scenario, the tenant

"acquire[s] a perpetual interest in the leased premises, which would justify his making permanent

improvements thereon, and enable him to avail himself of the value of the property thus

enhanced," while the fee simple owner/landlord "secure[s] the prompt payment in perpetuity of

the interest on a sum of money, equivalent to the value of the property." *Goldberg*, 85 A.3d at

237 (quoting *Banks*, 45 Md. at 218).

Pursuant to a ground rent lease, the landlord has "a bundle of vested rights" that "*cannot*

*be separated* one from the other; together they are the essence of this unique property interest."

*Goldberg*, 85 A.3d at 241 (quoting *Muskin*, 30 A.3d at 971 (emphasis from *Goldberg* removed;

emphasis added)).  Those two rights are "the reversionary interest to re-enter the property in the

event of a default or if the leaseholder fails to renew" and, significantly to this case, "a

contractual right to receive ground rent payments."  *Id.* (quoting *Muskin*, 30 A.3d at 971

(emphasis from *Goldberg* removed)).  Notably, "vested real property and contractual rights . . .

have been almost sacrosanct in our history," as these rights "are some of our most fundamental

rights and a long-standing tradition under our common law."  *Muskin*, 30 A.3d at 972.

Typically, a ground rent lease "specifies . . . what action the lessor may pursue in court if the lessee is late paying rent," such as

> (1) to make distress on the arrearage [i.e., to seize the tenant's property to ensure payment]; (2) after 60 days of nonpayment, to take over the premises by re-entry and hold them until the arrearage is paid up; and (3) after six months of nonpayment, re-enter the premises and possess them as if the lease had never been made.

*Goldberg*, 85 A.3d at 238 (internal citations omitted).  A landlord also may pursue traditional common law remedies, which include (1) "accept[ing] a surrender of the lease and thereby terminat[ing] the tenancy"; (2) "reenter[ing] the premises" and "attempt[ing] to re-let the property for the tenant's benefit, and hold[ing] the tenant liable" for the difference between the rent due under the lease and the rent so obtained; and (3) "do[ing] nothing and hold[ing] the tenant liable for the entire amount of rent payable during the remaining term of the lease."[3] *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 829 A.2d 976, 988–89 (Md. 2003).

Thus, a landlord under a ground rent lease may hold the tenant liable for unpaid rent.  *See Donelson v. Polk, by her Husband*, 2 A. 824, 826 (Md. 1886) (observing, in a case brought by landlord for payment of "arrearages of ground rent" and taxes due under a ground rent lease, that "it is a settled principle that a court of equity will never require that a party should insist upon a forfeiture as a remedy; and moreover, it is the absolute right of the [ground lease landlord] to insist upon *the performance of the covenants* of the lease, or compensation in damages for the

---

[3] Although "the Legislature, by statute, effectively abrogated th[e] third option with respect to residential leases by requiring residential landlords to mitigate damages that result from a tenant's termination of occupancy before the end of the term," and the Maryland Court of Appeals has observed that "[m]ore contemporary common law has sought to achieve the same result with respect to commercial leases," the Maryland appellate courts have not "resolve[d] that issue," *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 829 A.2d 976, 989 (Md. 2003), thereby seemingly leaving the third option available to commercial landlords.

breach thereof, by those upon whom such covenants are binding by reason of their relation to the estate"). Indeed, "[t]he right of re-entry is inserted into the ground lease principally as security for the payment of rents." *Goldberg*, 85 A.3d at 238. Transamerica does not appear to challenge the availability of a suit for unpaid rent under other circumstances; it simply argues that the option is not available to Rockledge under the contract at issue in this case. *See* Def.'s Reply & Opp'n 10 (arguing that Rockledge cannot pursue its "common law right to sue a <u>tenant</u> for breach of the covenant to pay rent," because "the landlord-tenant relationship between Rockledge and Transamerica ceased upon the termination of the Ground Lease").

## **Factual Background**[4]

Rockledge became the Landlord under the Ground Lease for 6610 Rockledge Drive, Bethesda, Maryland 20817 (the "Property") that its predecessor in interest entered into on August 27, 1980. Jt. Stmt. ¶¶ 1, 5, ECF No. 31. The original tenant, Two Rockledge Associates ("TRA"), used the property interest subject to the Ground Lease (the "Leasehold Interest") to secure a $16 million promissory note (the "Loan").[5] *Id.* ¶¶ 13–16, 21–23. Somewhat unusually,

---

[4] Because the parties filed cross-motions for summary judgment, "'each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant.'" *Lynn v. Monarch Recovery Mgmt., Inc.*, No. WDQ-11-2824, 2013 WL 1247815, at *1 n.5 (D. Md. Mar. 25, 2013) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003)).

[5] "For reasons not relevant to this proceeding, the loan was issued . . . to a separate tenant affiliate, TRL, LLC, and was guaranteed by TRA." Pl.'s Opp'n & Mem. 2. Many of the entities that were, at different times, parties to the contracts at issue shared personnel and/or stockholders, including members of the Camalier family, which had owned the Property since 1911. Jt. Stmt. ¶¶ 1–8, 11–13, 18–21. Transamerica is troubled by the fact that the Camalier family and its various related business entities were, in essence, both Landlord and Tenant under the Ground Lease, and borrower (and defaulter) under the Loan. Def.'s Mem. 1–2, 4, 10 n.2. But, as Rochledge points out, while this undoubtedly rankles Transamerica's sense of fairness, there has been no showing that any of the various Camalier affiliated entities was a sham or acted in a manner that was not lawful. But it did not help that Rockledge touted its business

for lenders are not typically so accommodating, the Loan was made subordinate to the Ground Lease and subject to its terms. *Id.* Transamerica did not originate the Loan, but rather acquired it from another entity, along with an Indemnity Leasehold Deed of Trust, Security Agreement and Fixture Filing that secured the Loan with the Leasehold Interest. *Id.*

In about June 2014, Transamerica issued a Notice of Default to the borrower, which had defaulted on the Loan, and Rockledge issued a Notice of Default to TRA, which had stopped paying rent under the Ground Lease. *Id.* ¶¶ 27, 31, 35, 36. After receiving the Notice of Default, TRA informed Rockledge that it did not "have sufficient funds to make the payment of Fixed Rent that is due" and did not "foresee having sufficient funds to pay the Fixed Rent in the future," and therefore it "waive[d] the right to receive any further notices of default under the Ground Lease." Jt. Stmt. ¶ 43 (quoting July 14, 2014 Ltr., Jt. Ex. 12, ECF No. 34-2, at 118).

Transamerica cured the default to continue the Leasehold Interest (in order to preserve its right to foreclose on it), and paid rent through December 2015. *Id.* ¶¶ 27, 31, 35, 36, 44–45, 49, 68, 72, 74. In October 2015, it foreclosed on the Deed of Trust and acquired the Leasehold Interest in the Property, thereby succeeding TRA as Tenant under the Ground Lease.[6] *Id.* But,

---

acumen, while questioning Transamerica's in deciding to foreclose on the Ground Lease, thereby becoming the Tenant and obligated to pay rent. Pl.'s Opp'n & Mem. 1–2, 19.

[6]     On or about July 10, 2014, Rockledge sent a letter to TRA, which stated:

Dear Tenant:

As provided in Section 3.1.2 of the Ground Lease, Fixed Rent is due the first day of each month in advance. The Fixed Rent due for July, 2014 in the amount of $92,114.28 has not been paid.

Per Section 10.1 of the Ground Lease, notice of default is hereby given to Tenant and pursuant to Section 11.1 thereof to Lender. If either Tenant or Lender fails to cure said default timely, the Lease shall terminate without further action of Landlord and this Lease shall be of no further force or effect.

after Rockledge declined its request to a reduction in ground rent and, instead, raised the ground rent, Transamerica "decided to walk away from its Leasehold Interest" and stopped making its monthly payments under the Ground Lease after December 2015. *Id.* ¶¶ 32, 34, 59, 64, 78–79, 82, 84.

Relevantly, Article X of the Ground Lease provides:

<u>DEFAULTS</u>

10.1 <u>Events of Default</u>. If Tenant shall default in the performance of any of its obligations to pay the Fixed Rent or Additional Rent hereunder and if such default shall continue for thirty (30) days after written notice from Landlord designating such default or if within ninety (90) days after written notice from Landlord to Tenant specifying any other default or defaults Tenant has not commenced diligently to correct the default or defaults so specified or has not thereafter diligently pursued such correction to completion, then, and in any of such cases, this Lease shall terminate without further action of Landlord and this Lease shall be of no further force or effect and Landlord and the agents and servants of Landlord lawfully may, in addition to and not in derogation of any remedies for any preceding breach of covenant, immediately or at any time thereafter and without demand or notice and with or without process of law enter into and upon the Premises or any part thereof in the name of the whole and repossess the same as of Landlord's former estate and expel Tenant and those claiming through or under Tenant (with or without the institution of legal proceedings to evict) and remove its and their effects without being deemed guilty of any manner of trespass and without prejudice, to any remedies which might otherwise be used for arrears of rent or prior breach of covenant, and Landlord, without notice to Tenant, may store Tenant's effects, and those of any person claiming through or under Tenant at the expense and risk of Tenant, and, if Landlord so elects, may sell such effects at public auction or private sale and apply the net proceeds to the payment of all sums due to Landlord from Tenant if any, and pay over the balance, if any, to Tenant.

10.2 <u>Exclusive Remedy</u>. In the event that this Lease is terminated under any of the provisions contained in Section 10.1 or shall be otherwise terminated for breach of any obligation of Tenant, Landlord's sole and exclusive remedy shall be the acquisition of title to the buildings as provided in Section 7.4 above, free and clear of all rights of Tenant or those claiming by, through or under Tenant.

Your immediate action is required.

Jt. Stmt. ¶ 36 (quoting July 10, 2014 Ltr., Jt. Ex. 10, ECF No. 34-2, at 99.)

Ground Lease art. X, Jt. Ex. 1, ECF No. 34-1.

During a phone call on January 6, 2016, Rockledge "advised … Transamerica[] that January 2016 rent for the Leasehold Interest had not been paid," after which the Landlord drafted, but did not send, a notice of default to Transamerica.  Jt. Stmt. ¶¶ 85, 88; *see also* Jan. 6, 2016 Rockledge internal email, Jt. Ex. 25, ECF No. 34-3, at 78 (stating that, during a call with regard to "setting of the subsequent base lease year rent," Rockledge "inquired as to the rent for [J]anuary" and Transamerica stated that it "had instructed [its tenant] not to pay it," that "there was no way . . . [T]ransamerica[] could justify paying the existing ground rent of $94,877.89," and that "without a substantial reduction in ground rent he didn't see how they . . . could go on with the property").  Instead, it filed this suit for breach of covenant to collect unpaid rent under the Ground Lease.  Compl., ECF No. 1.

Transamerica filed a Counterclaim, seeking a declaratory judgment that if it "has defaulted, the Ground Lease has terminated and Rockledge is only entitled to its exclusive remedy pursuant to Section 10.2 [providing for acquisition of title to the buildings on the Property]."  Countercl. 7–8, ECF No. 12.  Transamerica then notified Rockledge that it "agree[d] to the immediate relinquishment of its possession of all improvements on the Property to which it has title, and further agree[d] to immediately facilitate the transfer of title to such improvements to Rockledge."  Jt. Stmt. 93 (quoting Apr. 20, 2016 Ltr., Jt. Ex. 27, ECF No. 34-3, at 91–92).  Additionally Transamerica stated that it "expressly waive[d] its rights to the receipt of any notice of default [from Rockledge] required under Section 10.1 of the Ground Lease." *Id.* ¶ 94 (quoting Apr. 20, 2016 Ltr. 2).  Rockledge responded that it did "not acquiesce in the assertions made in [the] letter." *Id.* ¶ 95.

The parties cross-filed motions for summary judgment, asking me to determine whether Rockledge could pursue damages for breach of the covenant to pay rent or whether, under the Ground Lease and based on its correspondence with Transamerica to date, its only remedy was to repossess the Property and acquire title to the improvements on it.  *See* Def.'s Mem. 9; Pl.'s Opp'n & Mem. 1, 9.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

**Contract Interpretation**

Maryland law[7] regarding contract interpretation is well-settled. "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Tomran, Inc. v. Passano*, 891 A.2d 336, 344 (Md. 2006)). Nonetheless,

> [c]ourts in Maryland apply the law of objective contract interpretation, which provides that "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."

*Id.* (quoting *Slice v. Carozza Props., Inc.*, 137 A.2d 687, 693 (Md. 1958)). Thus, a contract "is 'measured by its terms unless a statute, regulation, or public policy is violated thereby.'" *Connors v. Gov't Employees Ins. Co.*, 88 A.3d 162, 166 (Md. Ct. Spec. App. 2014) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)).

When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012) (citations and quotation marks omitted); *see C B Structures, Inc. v. Potomac Elec. Power Co.*, 122 F. Supp. 3d 247, 251–52 (D. Md. 2015); *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 23 (Md. 2013). "As such, '[a] contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution.'" *Dumbarton*, 73 A.3d at 232 (quoting *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003)). Additionally, the court must construe the contract "in its entirety and, if reasonably possible, [give] effect . . . to each clause so that a court

---

[7] The Ground Lease provides that Maryland law governs. *See* Ground Lease § 12.1.

10

will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Id.* at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)); *see also Calomiris v. Woods*, 727 A.2d 358, 366 (Md. 1999) ("Where possible, courts should avoid interpreting contracts so as to nullify their express terms."). In these circumstances, the contract's construction is "an issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990); *Pacific Indem. Co.*, 488 A.2d at 489.

When, however, "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract [is] submitted to the trier of the fact for interpretation." *Plymouth Rubber*, 569 A.2d at 1296. Nonetheless, "[t]he court may construe an ambiguous contract if there is no factual dispute in the evidence." *Pac. Indem. Co.*, 488 A.2d at 489. Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." *Bd. of Educ. of Charles Cnty.*, 569 A.2d at 1296. "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Dumbarton*, 73 A.3d at 233 (quoting *Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n*, 582 A.2d 493, 496 (Md. 1990)).

## Discussion

The parties agree that Transamerica has failed to pay rent due under the Ground Lease since December 2015. Jt. Stmt. ¶ 84. They also agree that, with regard to the effects of Transamerica's failure to pay rent and the remedies available to Rockledge, "the language of the Ground Lease is clear." Def.'s Mem. 10; *see* Pl.'s Opp'n & Mem. 9 (referring to "the plain

language of the ground lease"). But, they disagree about what the effects of Transamerica's failure to pay rent were and what remedies Rockledge could pursue. Their disagreement about the meaning of the Ground Lease's terms, however, does not render the contract ambiguous. *See Bd. of Educ. of Charles Cnty.*, 569 A.2d at 1296. Rather, I will consider the Ground Lease's language to determine if it could have more than one meaning. *See id.*

*Remedies Available for Default*

According to Transamerica, "[i]f indeed Rockledge wants to pursue Transamerica for a default of nonpayment of rent, [§ 10.1 of] the Ground Lease requires that it notify Transamerica of the default and provide for a cure period," and, if "Rockledge elects, as the controller of notice, not to provide a notice of default and allow the cure period, then it cannot pursue remedies." Def.'s Mem. 17. In Rockledge's view, § 10.1 provided a remedy for the Tenant's default, but it was neither the exclusive remedy nor the one the Landlord elected to pursue. Pl.'s Opp'n & Mem. 9–11. Rather, the Landlord contends, "Maryland common law recognizes at least three distinct remedies for landlords when a tenant attempts to walk away from its obligations and otherwise breaches a commercial lease," and "[i]n Section 12.3 of the ground lease, the parties clearly expressed their intention to give landlord all of the rights available at common law, which necessarily includes the right to sue for breach of the covenant to pay rent." *Id.* at 11.

The plain language of the contract supports Rockledge's interpretation. Article X of the Ground Lease provides for the lease to "terminate without further action of Landlord" and for the Landlord to "enter into and upon the Premises … and repossess the same as of Landlord's former estate and expel Tenant and those claiming through or under Tenant" under either of two scenarios. Ground Lease § 10.1. First, the lease will terminate and the Landlord may repossess

the Property if the Tenant defaults by failing to pay rent *and* fails to cure the default within thirty days after the Landlord provides written notice of the default. *Id.* Second, the lease will terminate and the Landlord may repossess the Property if the Tenant defaults on any other contractual obligation *and* fails to begin diligently correcting or then fails to diligently finish correcting the default within ninety days after the Landlord provides written notice of the default. *Id.* Notably, Article X is silent about what happens if the Landlord does *not* provide written notice of the default. *See id.* Section § 12.3, however, states that the parties also have common law remedies for breaches. Ground Lease § 12.3 ("Any and all rights and remedies which either party may have under this Lease or *by operation of law*, either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them whether exercised by said party or not, shall be deemed to be in exclusion of any other . . . ." (emphasis added)).

Second 10.2 provides that, if the Lease is terminated under either scenario under § 10.1 or "otherwise terminated for breach of any obligation of Tenant," then "Landlord's sole and exclusive remedy shall be the acquisition of title to the buildings . . . , free and clear of all rights of Tenant or those claiming by, through or under Tenant." *Id.* § 10.2. As Transamerica sees it, this "sole and exclusive remedy" is the "sole and exclusive remedy" for *any* breach. Def.'s Mem. 16. This interpretation would make § 10.2 a remedy that excludes all other remedies and render it contradictory to other sections, such as § 12.3, that provide other remedies. Such an interpretation is impermissible under Maryland contract law and the language of the Ground Lease itself. *See Dumbarton*, 73 A.3d at 232–33; *Calomiris*, 727 A.2d at 366; Ground Lease § 12.3 ("Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate and

cumulative and *shall not be deemed inconsistent with each other*; and no one of them whether exercised by said party or not, *shall be deemed to be in exclusion of any other . . . .*") (emphasis added).  Indeed, § 10.1 provides that the remedy of repossession if the lease terminates is "*in addition to and not in derogation of* any remedies for any preceding breach of covenant." Ground Lease § 10.1 (emphasis added).  Section 10.1 also provides that the remedy of repossession is available to the Landlord "without prejudice to *any remedies which might otherwise be used* for arrears of rent or prior breach of covenant."  *Id.* (emphasis added); *see also id.* § 11.2 ("[Nothing herein shall preclude Landlord from exercising any rights or remedies under the Lease with respect to any other default by Tenant during any period of such forbearance.").  Moreover, other sections explicitly provide the Landlord with other remedies. *E.g.*, Ground Lease § 4.3 ("If Tenant shall fail to effect or maintain such insurance for the benefit of Landlord, Landlord may effect the same and Tenant agrees to pay on demand any amount properly paid by Landlord for such purpose, and, in case of its failure to so pay, the same shall be added to and become part of the installment of rent due under the terms of this Lease."); *id.* § 4.5 ("[I]n the event of the failure of Tenant to pay the sum or sums for which Tenant shall become liable [in defending a suit brought against Landlord], then Landlord may pay such sum or sums, with all interest and charges which may have accrued thereon, and the amount so paid by Landlord shall be payable by Tenant to Landlord upon demand.").  Therefore, only by reading it in isolation from § 10.1 and the other sections in the lease that provide remedies to the Landlord in the event of a breach by the Tenant, can § 10.2 provide the exclusive remedy for any breach.

Rather, § 10.2 expressly states that it provides the exclusive remedy *when the Lease is terminated*.  *See* Ground Lease § 10.2 (stating that, if the "Lease is *terminated*" under § 10.1 or "otherwise *terminated* for breach of any obligation of Tenant," then "Landlord's sole and

exclusive remedy shall be the acquisition of title to the buildings") (emphases added).  As long as the Ground Lease remains in effect, then the other remedies it references, including common law remedies, are available.  *See id.* § 12.3.  This reading gives "effect . . . to each clause," and does not "cast[] out or disregard[] a meaningful part of the language."  *See Dumbarton*, 73 A.3d at 232–33.  Indeed, § 10.1 refers to remedies for "preceding" or "prior" breaches:  The Landlord could choose to try those remedies for earlier breaches *before* terminating the Ground Lease pursuant to § 10.1 and thereby ending the availability of the alternative remedies because the Ground Lease would no longer be in effect.  With this interpretation, the provisions of Article X also are in harmony with § 12.3's language that the remedies stated in the Ground Lease and available at common law are "distinct, separate and cumulative" and do not exclude each other.

That said, the Ground Lease is not exactly a model of clarity, as § 12.3 also provides that "any two or more or all of such rights and remedies" that "either party may have under th[e] Lease" may "be exercised at the same time." This provision at first seems to contradict § 10.2's provision that acquisition of title is the Landlord's "sole and exclusive remedy."  But, this inartful draftsmanship is not tantamount to ambiguity, as the contract is susceptible to only one meaning that accounts for both of these provisions.  Reading the contract as a whole, as the case law instructs me to do, *Dumbarton*, 73 A.3d at 232–33, it is evident that the Landlord could seek various remedies for specific breaches.  *E.g.*, Ground Lease §§ 4.3 & 4.5.  In particular, the Landlord could pursue a common law option to remedy a breach of the covenant to pay rent.  *See* Ground Lease §§ 10.1, 12.3.  Alternatively, or after having done so, if faced with another default, the Landlord could elect to pursue termination and repossession pursuant to Article 10.

The acquisition of title only becomes the exclusive remedy *after* the lease terminates, at which time neither party can pursue any remedy "under th[e] Lease" because the Ground Lease

no longer is in effect by operation of § 10.1. Indeed, in arguing that Rockledge cannot pursue its "common law right to sue a <u>tenant</u> for breach of the covenant to pay rent," Transamerica contends that, "in order for a covenant to pay rent to exist, there also must be a landlord-tenant relationship" and, in Transamerica's view, "the landlord-tenant relationship between Rockledge and Transamerica ceased upon the termination of the Ground Lease." Def.'s Reply & Opp'n 10. Thus, Transamerica acknowledges that there are other remedies available to the Landlord and that they cease to exist when the lease terminates. Where it differs from Rockledge, however, is its insistence that the lease has terminated, whereas Rockledge insists that it has not. In sum, when the Ground Lease is construed in its entirety, giving effect to each provision without disregarding any of them, the unambiguous terms show that termination, repossession and acquisition of title was one remedy Rockledge could pursue, but it was not the only one; only after the Ground Lease terminated by operation of § 10.1 did the remedies it provided cease to be available to the parties. *See Dumbarton*, 73 A.3d at 232.

*Remedies Available to Rockledge under the Circumstances*

I next must address whether the undisputed evidence establishes that, under the circumstances of this case, Rockledge had to pursue only the remedy of termination, repossession, and acquisition of title. Transamerica advances four theories in support of its belief that Rockledge had no choice but to terminate the agreement, forego any claim for unpaid rent, repossess the Property, and assume title to the buildings.

*1. Automatic termination*

In Transamerica's view, its default by failing to pay rent *automatically* "resulted in a termination of the Ground Lease," Def.'s Mem. 11–12, 17, such that "the acquisition of the title to the buildings on the Property" is "the exclusive remedy," *id.* at 16, 19. Little analysis is

necessary in this regard.  As discussed, the plain language of § 10.1 states that the default leads

to the termination of the Ground Lease only if other conditions are met:

> If Tenant shall default in the performance of any of its obligations to pay the
> Fixed Rent or Additional Rent hereunder *and if such default shall continue for*
> *thirty (30) days after written notice from Landlord designating such default or if*
> *within ninety (90) days after written notice from Landlord to Tenant specifying*
> *any other default or defaults Tenant has not commenced diligently to correct the*
> *default or defaults so specified or has not thereafter diligently pursued such*
> *correction to completion*, then, and in any of such cases, this Lease shall terminate
> without further action of Landlord and this Lease shall be of no further force or
> effect . . . .

Ground Lease § 10.1 (emphasis added).  Consequently, termination of the Ground Lease is *not*

automatic, but rather only occurs if the Landlord gives written notice of the default and the

Tenant fails to cure the default.  *See id.*

### 2.  Actual notice

Transamerica alternatively argues that, even if the termination was not automatic,

"written notice of default for nonpayment [was] not required" for termination under the

circumstances of this case, despite the plain language of § 10.1, because, "under Maryland law,

the giving of such written notice by Landlord is not required when the Tenant has <u>actual</u> notice

of its default." Def.'s Mem. 12.  Transamerica insists that it informed Rockledge that it was

aware of its default and would not be curing it, obviating the need for written notice.  *Id.* at 13.  It

is true that on January 6, 2016, Rockledge verbally alerted Transamerica to the default, and

Transamerica responded that it would not be paying January's rent and "didn't see how they . . .

could go on with the property." Jan. 6, 2016 Rockledge internal email.  And, on March 14, 2016,

Rockledge sent to Transamerica via Federal Express a copy of the Complaint it filed in this case,

which alleged the failure to pay rent. Jt. Ex. 26, ECF No. 34-3, at 81–89; *see* Compl.

Additionally, on April 20, 2016, Transamerica sent a letter response to the Complaint, conceding

that it "is in default of its obligations to pay rent under the Ground Lease," asserting that "under Section 10.1 of the Ground Lease, the Ground Lease has automatically terminated," and agreeing to "relinquish[] . . . possession of all improvements on the Property to which it has title" and to "facilitate the transfer of title to such improvements."  Jt. Ex. 27, ECF No. 34-3, at 91.

Transamerica relies on *B & P Enterprises v. Overland Equipment Co.*, 758 A.2d 1026, 1041 (Md. Ct. Spec. App. 2000), in which the Maryland Court of Special Appeals concluded that written notice was unnecessary and "in th[at] case would have been, at best, duplicative," given the landlord's "actual, ongoing knowledge of [tenant]'s complaints under the terms of the Lease."  There, the provision of the lease regarding a default by the landlord stated:

> If Landlord fails to perform any covenant, condition, or agreement contained in this Lease within thirty (30) days *after receipt of written notice from Tenant specifying such default*, or if such default cannot reasonably be cured within thirty (30) days, if Landlord fails to commence to cure within said thirty (30) day period, then Landlord shall be liable to Tenant for any damages sustained by Tenant as a result of Landlord's breach.

*B & P Enters.*, 758 A.2d at 1036 (quoting lease).  The lease also provided that any required notice had to "be in writing" and "personally delivered or sent by United States mail, certified or register [sic] . . . ."  *Id.* (quoting lease).  The parties corresponded via facsimile about the landlord's alleged failure to pay the costs associated with relocating the tenant's storage lot, as provided under the lease.  *Id.* at 1030, 1032.  Yet, it was "undisputed that [the tenant] never notified [the landlord] of an alleged default under the Lease via certified mail, registered mail, or personal service."  *Id.*  The trial court nonetheless found for the tenant, implicitly finding, without explicitly stating, that the notice requirement was not a condition precedent that had to occur before the landlord was obligated to perform.  *Id.* at 1036–37.

The landlord appealed, and the appellate court considered the written notice requirement. *Id.* at 1038.  The court observed that conditions precedent have "potentially severe implications,"

as "[g]enerally, when a condition precedent is unsatisfied, the corresponding contractual duty of the party whose performance was conditioned on it does not arise," and therefore, "courts have been careful to distinguish a condition precedent from a covenant, which ordinarily requires only substantial compliance." *Id.* It concluded that the provision regarding the landlord's default "contain[ed] an express condition," but noted that "a court may excuse the non-occurrence of [a] condition" if "the non-occurrence of [that] condition would cause disproportionate forfeiture, . . . unless its occurrence was a material part of the agreed exchange." *Id.* at 1040 (quoting Restatement § 229). It excused the failure to comply with the notice requirement because the landlord "had actual, ongoing knowledge of [the tenant's] complaints under the terms of the Lease." *Id.* at 1041.

As Rockledge notes, *B & P Enterprises* is inapposite because the court accepted actual notice in that case "in the context of a defaulting party seeking to use a lease's notice provision as a shield against liability for breach of covenant," whereas here "Transamerica is seeking to use the notice provision as a sword to force termination of the lease—a situation that the *B & P* court neither contemplated nor addressed." Pl.'s Opp'n & Mem. 15. Indeed, while the parties dispute whether the written notice requirement is a condition precedent or simply a covenant that can be satisfied through substantial compliance, *see* Def.'s Mem. 13; Pl.'s Opp'n & Mem. 16, their debate misses the mark.[8] Regardless whether the Landlord's written notice was a condition precedent or a covenant, the Tenant's duty to pay rent was not contingent on it. The Tenant's duty to pay rent arose under §§ 3.1.2 and 3.2 of the Ground Lease, which provided that "Tenant covenants and agrees to pay Landlord rental . . . in equal monthly installments of one-twelfth of

---

[8] I note that Ground Lease § 12.1 explicitly provides that "Landlord and Tenant agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph thereof."

the respective annual rate on the first day of each month in advance," and that "[i]n order that the Fixed Rent shall be absolutely net to Landlord, Tenant covenants and agrees to pay . . . taxes, betterment assessments and utilities charges with respect to the Premises . . . ."  Nor was termination of the lease a duty, imposed on either the Landlord or the Tenant, that arose following written notice.  Thus, Transamerica was obligated to pay rent regardless whether Rockledge provided written notice that its payments were overdue, and actual notice of default by Transamerica did not trigger a duty on the part of Rockledge to terminate the lease.  *See id.*

Common sense compels this interpretation.  If Transamerica failed to pay rent, it necessarily would know that it defaulted on the lease and would not need notice of the same, written or otherwise.  Consequently, if Transamerica's reading of the lease prevailed, there never would be an instance in which the Tenant defaulted on the rent and did not timely cure the default that § 10.1 did not apply to, which is the incorrect result, as discussed above.  Further, there would be no reason to include a provision requiring notice by the Landlord.  Thus, finding that actual notice sufficed would be illogical, make § 10.1 inconsistent with other provisions of the Ground Lease, and render the written notice requirement superfluous, contrary to the cannons of contract construction.  *See Dumbarton*, 73 A.3d at 232–33.  Therefore, written notice was required to effect a termination, and the Ground Lease did not terminate simply because Transamerica knew that it was in default on its obligation to pay rent.

   3.   *Waiver of the notice requirement*

Alternatively, Transamerica contends that it "expressly waived its right to . . . notice" of default prior to termination of the Ground Lease, first in its January 2016 correspondence stating that it would not cure its default, and again in its April 20, 2016 letter in response to Rockledge's Complaint.  Def.'s Mem. 15.  Transamerica insists that "[t]he written notice requirement under

Section 10.1 of the Ground Lease is for the benefit of tenant," and "[a] party may waive any provision of a contract that was made for its benefit." *Id.* But this is not so where the contractual language benefits *both* parties, and one party's waiver to its own benefit concomitantly is in derogation of the other party's benefit. *See* 13 *Williston on Contracts* § 39:24.

"Waiver is 'the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.'" *Kolb v. Acra Control, Ltd.*, 632 F. App'x 87, 92 (4th Cir. 2015) (quoting *Myers v. Kayhoe*, 892 A.2d 520, 530 (Md. 2006) (citations and internal quotation marks omitted)). Certainly, "the parties [to a contract] by their conduct may waive the requirements of [the] written contract." *Id.* (quoting *Questar Homes of Avalon, LLC v. Pillar Constr., Inc.*, 882 A.2d 288, 294 (Md. 2005) (alteration in original)). And, "[e]ither party to a contract may waive any of the provisions made for his benefit." *Id.* at 93–94 (quoting *Cattail Assocs., Inc. v. Sass*, 907 A.2d 828, 843 (Md. Ct. Spec. App. 2006) (citation and internal quotation marks omitted)).

But, "a party cannot waive a contractual requirement that benefits both sides to the transaction." *Id.* at 94 (quoting *Cattail Assocs.*, 907 A.2d at 843 (citation and internal quotation marks omitted)). Stated differently, "a waiver of contract requirements and conditions may not be made unilaterally when it would deprive the nonwaiving party of a benefit under the provision in question." 13 *Williston on Contracts* § 39:24. Thus, typically, "when one party seeks to enforce a contract and compel performance by the other party despite the nonoccurrence of a condition precedent to performance," waiver of that "requires a determination [that] the condition was inserted in the contract solely for the benefit of the party seeking to enforce the contract despite its nonoccurrence." *Brown v. Allied Home Mortg. Capital Corp.*, No. JKB-11-

21

667, 2011 WL 3351532, at *3 (D. Md. Aug. 2, 2011) (quoting *Cattail Assocs.*, 907 A.2d at 843 (quoting 13 *Williston on Contracts* § 39:24) (other citations omitted)).

To be sure, the written notice requirement certainly benefits the Tenant, as it affords the Tenant the opportunity to cure the default instead of having the Ground Lease terminate.  Yet § 10.1 as a whole undoubtedly benefits the Landlord by, as Transamerica notes, "provid[ing] landlord a remedy that does not arise under common law (i.e., acquisition of title to the building on the Property upon termination of the Ground Lease)."  *See* Def.'s Reply & Opp'n 12.  Also, the written notice requirement itself benefits the Landlord by permitting the Landlord to elect one of two options:  The Landlord may sue for breach of the covenant to pay rent under the common law *or* issue a written notice of default.  If Transamerica could waive notice unilaterally, the Tenant effectively would choose the Landlord's remedy for it, circumventing paying past due rent by eliminating the Landlord's option to sue for unpaid rent instead of issuing notice, and thereby walking away from the Ground Lease.  *See Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 829 A.2d 976, 989 (Md. 2003) ("[B]ecause a surrender terminates the tenancy, the tenant's obligation to pay rent ceases.").  Thus, Transamerica's waiver "would deprive [Rockledge as the] nonwaiving party of a benefit under the provision in question."  *See* 13 *Williston on Contracts* § 39:24.  Therefore, this provision was not "inserted in the contract solely for the benefit of [Transamerica as the] party seeking to enforce the contract despite its nonoccurrence."  *See Brown*, 2011 WL 351532, at *3 (quoting *Cattail Assocs.*, 907 A.2d at 843).  Consequently, Transamerica cannot waive this provision unilaterally.  *See Kolb*, 632 F. App'x at 94; *Cattail Assocs.*, 907 A.2d at 843.

*4.   Written notice*

Finally, Transamerica argues that "Rockledge's filing of its Complaint on March 10, 2016" satisfied the written notice requirement (thereby terminating the lease and triggering the exclusive remedy of acquisition of title to the leasehold improvements, to the exclusion of collecting unpaid rent), as "only substantial compliance is ordinarily required with respect to a covenant [in a contract]."  Def.'s Mem. 13–14.  In its view, the Complaint put it on notice, even without using the term "default," and "it is irrelevant that the Complaint did not assert a cure period to avoid termination of the Ground Lease," because Transamerica previously waived its right to cure.  *Id.* at 14–15.  Rockledge counters, similarly to its arguments with regard to actual notice, that substantial compliance does not suffice "where, as here, the party in default is the one seeking to use the notice provision as a sword to force early termination of the lease," and that, in any event, "Section 10.1 is not simply a 'covenant' by the landlord to the tenant."  Pl.'s Opp'n & Mem. 16.  Noting that § 10.1 refers to "written notice from Landlord *designating such default*," Rockledge argues that "'[d]esignate' connotes some official or formal action," such that the Complaint for breach of the covenant to pay rent cannot qualify as a designation of a default by the Landlord that operates as a termination of the lease.

Yet, by any imagination, a Complaint is a formal action.  And the Complaint stated that "Transamerica has failed to pay the rental installments of $94,877.69 for the months of January, February, and March 2016," and "Transamerica breached the covenant to pay ground rent when it failed to pay the rental installments of $94,877.69 for the months of January, February, and March 2016."  Compl. ¶¶ 22, 26.  Thus, the Complaint clearly "designates" Transamerica's default.

Further, the Ground Lease's notice provision simply provides that "[e]very notice and demand required or permitted to be given under this Lease shall be in writing and deemed to have been duly given when mailed postage prepaid by certified or registered mail, with or without return receipt requested . . . ."  Ground Lease § 12.8.  Neither party argues that this provision is other than a covenant, as the Ground Lease provides.  *See* Ground Lease § 12.1 ("Landlord and Tenant agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph thereof.").  Service of the Complaint on March 15, 2016, *see* Aff., ECF No. 7, as well as a courtesy copy sent to Transamerica via Federal Express priority overnight service on March 14, 2016, *see* Jt. Ex. 26, ECF No. 34-3, at 81–89, satisfy this notice provision, as it is undeniable that Transamerica, which is actively defending this action, received the Complaint.  Thus, the Landlord provided the Tenant with written notice of the default no later than March 15, 2016.

This does not, as Transamerica argues, nullify Rockledge's action for unpaid rent.  Such an argument is nonsensical given that, as previously discussed, the option of seeking unpaid rent under the common law also was a remedy available to the Landlord.  Under this theory, in any instance in which the Landlord exercised its right to file suit for unpaid rent, service of the complaint necessarily would defeat the action by providing notice of the default and thereby bringing the failure to pay rent into the realm of § 10.1 and terminating both the Ground Lease and the Landlord's right to collect rent under it.

The better interpretation that accounts for the entirety of the Ground Lease without disregarding any provisions, *see Dumbarton*, 73 A.3d at 232–33, is that the Ground Lease terminates thirty days after March 15, 2016, that is, April 14, 2016.  But, the termination and the

Landlord's right to repossession are "without prejudice[] to any remedies which might otherwise be used for arrears of rent or prior breach of contract," such as this pending action. *See* Ground Rent § 10.1. Thus, Rockledge may recover for unpaid rent, but only through April 14, 2016. Otherwise, Rockledge could continue to recover unpaid rent for the sixty-two years remaining under the Ground Lease and Transamerica would be powerless to do anything about it. It strains credulity to imagine, as Rockledge apparently does, that it may have its cake and eat it too, by collecting rent arrearages from Transamerica that exceed the deadlines for cure contained in § 10.1 of the Ground Lease, but avoid terminating the lease and Transamerica's obligations to pay rent for the duration of the leasehold through the pretense of not having provided "written notice" of the "default," despite having filed and served a lawsuit that pleads the very default of Transamerica's obligation to pay rent contemplated by § 10.1.[9] Such an interpretation is too clever (not to mention unfair) by half.

Indeed, had I adopted Rockledge's interpretation of the Ground Lease, ruling that the Complaint in this case was not a "written notice" and consequently the Ground Lease did not terminate, I would not have awarded damages equivalent to monthly unpaid rent through the date of this Memorandum Opinion. Nor would I have declared that Transamerica would be liable for monthly rent for decades to come. Rather, I would have certified to the Court of Appeals of Maryland the question of whether Rockledge, as the landlord under a ground rent lease for a commercial property, had the obligation to mitigate damages, as residential landlords have and as commercial landlords have outside of Maryland. *See Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 829 A.2d 976, 989 (Md. 2003).

---

[9] Although Rockledge never expressly says so, the coy implication of its briefing is that, if the Court were to adopt its interpretation of the Ground Lease, such would be the proper result.

### Conclusion

In sum, the plain language of the Ground Lease permits the Landlord to seek damages for unpaid rent, and the undisputed evidence shows that Rockledge properly pursued its claim for breach of the covenant to pay rent.  The plain language also provides for the termination of the lease on written notice of default to the Tenant that goes uncured, and the undisputed evidence shows that Rockledge provided written notice when it served its Complaint on March 15, 2016, such that the Ground Lease terminated thirty days later, on April 14, 2016.  Thus, while Rockledge may recover for unpaid rent, it only may recover unpaid rent for the period of January 1, 2016 through April 14, 2016.  Accordingly, Transamerica's Motion for Summary Judgment, ECF No. 43, IS GRANTED IN PART AND DENIED IN PART, and Rockledge's Cross-Motion for Summary Judgment, ECF No. 44, IS GRANTED IN PART AND DENIED IN PART. Specifically, Transamerica IS LIABLE to Rockledge for unpaid rent for the period of January 1, 2016 through April 14, 2016, but IS NOT LIABLE for any rent thereafter, as the Ground Lease terminated on April 14, 2016.  The parties shall confer with regard to the dollar amount of damages due given this ruling and, by February 24, 2017, inform the Court  of the dollar amount or, if they cannot agree, ask the Court to schedule a status conference to determine whether a trial as to damages is necessary.

A separate order shall issue.


Dated: February 3, 2017                                     _____/S/_____
                                                                          Paul W. Grimm
                                                                          United States District Judge

lyb